THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WALTER CADBY, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TERRY M. KORTUM, Appellant.

Fourth Department, April 7, 1978

## APPEARANCES OF COUNSEL

*Doyle, Diebold, Bermingham, Gorman & Brown (Joseph D. Bermingham, Jr.,* of counsel), for appellants.

*Edward C. Cosgrove, District Attorney (Judith Blake Manzella* and *John De Franks* of counsel), for respondent.

## OPINION OF THE COURT

DENMAN, J.

Defendants appeal from judgments of the Supreme Court, Erie County, entered May 5, 1976, upon pleas of guilty to two counts of criminal possession of a controlled substance in the seventh degree by defendant Cadby and one count of attempted criminal possession of a controlled substance in the sixth degree by defendant Kortum. Both defendants were sentenced to probationary terms. Defendants also appeal from orders dated December 17, 1975 and February 23, 1976, the first denying their motion to suppress evidence seized without a search warrant and the second denying their motion to reopen those proceedings because of newly discovered evidence.

During the afternoon of May 28, 1974, Howard Cohen, Linda Watson and Daniel Mardana were arrested by members of the Erie County Sheriff's Department Narcotics Squad for the sale of four and one-half pounds of alleged cocaine (later determined to be xylocaine, not a controlled substance) to an undercover deputy. While being questioned at the scene, Co-

hen, who was upset and crying, informed Chief of Narcotics Tuttolomondo that he had received the alleged cocaine from "Rex", whose last name and address he did not know. Cohen then corrected himself, stating that he got the drugs from Linda Watson, who got them from David Feuerstein, and that he did not know where the remainder of the drugs was.

Cohen was removed to Sheriff's headquarters where he underwent further questioning, primarily by Deputy Karam. When informed that he could get 25 years to life for the charge, and that his co-operation would be appreciated and mentioned to the District Attorney, Cohen responded to further questions regarding the source of the drugs. The information he gave led the deputies to the apartment of defendant Kortum where they found small quantities of LSD and marihuana and a quantity of a substance thought to be cocaine which substance also was later determined to be xylocaine. Defendants were arrested on the premises and were later indicted for possession of the LSD and marihuana.

At the hearing on defendants' motion to suppress that evidence, Deputy Karam testified with respect to the information given by Cohen, who, although under subpoena, could not be found to testify. He stated that Cohen said that he had picked up the alleged cocaine at an address on Prospect Avenue in Buffalo, and that he was to return to that location with the money from the sale ($45,000) by 7 o'clock that evening. Cohen is alleged to have stated further that there were marihuana, LSD and cocaine at that address, that the marihuana was in a suitcase in the back room off the kitchen, but that he did not know where the remainder of the alleged cocaine could be found in the house.

While Cohen was unsure of the address, he gave a description of the house and its surroundings and was able to locate it on a crude map drawn by one of the deputies. Cohen also provided a telephone number at which he was supposed to contact "Rex and Terry", who he now claimed supplied him with the drugs, concerning the transaction.

This information was in the possession of the deputies by 6:15 P.M., at which time they began a search warrant application and called the telephone company to determine the listing of the telephone number given by Cohen. Approximately one-half hour later, the phone company supplied the information, advising that the number was registered to a Terry Kortum at 502 Prospect Avenue. Deputy Pecoraro drove

to the address and found it to comport with the description given by Cohen. A surveillance team was dispatched to watch the house.

At approximately 7:15 P.M. Deputy Karam contacted a Judge of the City Court of Buffalo to alert him that a search warrant was being prepared for his signature. Sometime later a second call may have been made to the Judge after an expression of anxiety by Cohen that the deputies were "blowing his chance" by their delay and that the defendants might leave prior to the completion of the application. Subsequently, preparation of the warrant application was entrusted to another member of the department and Deputy Karam and two other deputies left for the Prospect Avenue address.

When they arrived, they immediately received a radio message from the surveillance team that two men were coming out of the house. The deputies radioed Chief Tuttolomondo at headquarters who told them to go in. The movement seen by the surveillance team was the first activity they had seen at the address. The deputies did not know who the two men were, but began running toward the house. They followed the defendants into the apartment, confronted them in the living room, and proceeded to search.

We are presented with two issues: whether there was probable cause to justify any search, and whether there were exigent circumstances such as to justify the warrantless search which took place.

The constitutional requirement of probable cause applies to all searches, whether or not conducted pursuant to a search warrant. *(People v White,* 16 NY2d 270.) As no warrant was obtained in this case, we may look to the entire record to determine whether probable cause for the search existed. (Cf. *People v Slaughter,* 37 NY2d 596; *People v Alfinito,* 16 NY2d 181.)

The basis for probable cause asserted here is the information provided by Cohen. That information must be measured by the now familiar two-pronged test first set forth in *Aguilar v Texas* (378 US 108). That test, as refined by subsequent cases (see e.g., *Spinelli v United States,* 393 US 410; *People v Wirchansky,* 41 NY2d 130) requires facts to demonstrate (1) some of the underlying circumstances from which the officer concludes that the informant is trustworthy and (2) some of the underlying circumstances from which the informant concluded that illegal activities are taking place on the

premises to be searched. This latter prong has been labeled by our Court of Appeals as the "basis of knowledge" test *(People v Hanlon,* 36 NY2d 549, 556).

Inasmuch as Cohen was previously unknown, his reliability and trustworthiness could not be established. The focus then shifts to the second prong to determine whether Cohen's information regarding the source and location of the drugs was reliable. We must, therefore, examine the conflicting stories given by Cohen concerning the same transaction.

The two statements were clearly contradictory. Not only does Cohen vacillate as to the source of the drugs—Watson and Feuerstein on the one hand, Rex and Terry on the other —but his stories are contradictory with respect to his knowledge of the location of the remainder of the alleged cocaine. In his earlier statement Cohen said that he did not know where the remainder of the cocaine was; later he said there was more cocaine at the Prospect address, although he did not know where.

Where an informant has told two stories, the function of the court is not to determine which is true but to decide whether either can be used to establish sufficient probability in light of the other. This presents a situation analogous to the impeachment of witnesses and, in this context, Cohen's two statements are clearly contradictory. (See *Larkin v Nassau Elec. R. R. Co.,* 205 NY 267, 269; *McCoy v Gorenstein,* 282 App Div 984.)

The contradiction was certainly known to the authorities. The first story was told to Chief Tuttolomondo; the second to Deputy Karam. However, immediately before the raid, the deputies radioed headquarters and received permission to proceed from Chief Tuttolomondo and the Sheriff. It can hardly be contended that Tuttolomondo, as the immediate superior of the deputies about to make the raid, had no idea what the men under his direction and control were doing, or on what basis they were proceeding. The directions given the deputies support no other conclusion than that Tuttolomondo authorized the search while aware that two conflicting stories had been told by the informant.

The question is thus whether, knowing that the informant had told two contradictory stories about the same transaction,* one could reasonably conclude on the basis of one of

---

* The requirement of prior knowledge of the contradiction on the part of the authorities is crucial. The New York courts have refused to allow subsequent

them that the law was being violated on the premises to be searched. *(People v Marshall,* 13 NY2d 28, 34.)

The People contend that Cohen's statement was against his penal interest and therefore reliable, relying on *United States v Harris* (403 US 573) and *People v Wright* (37 NY2d 88). That argument cannot be sustained, however, because both statements implicate Cohen in knowing possession of the drugs and thus there is no reason why the second story should be credited over the first.

The circumstances which surround the rendition of the two stories provide no objective basis for discrimination between them. One can conceive of circumstances in which the authorities would have valid reason not to credit one of two conflicting statements; however, the record does not reflect even a suspicion that Cohen's initial story was a fabrication in whole or in part. Nor does a review of the facts reveal any objective basis for the authorities to have held such an unexpressed belief.

The People finally seek to discharge their burden of distinguishing between the two stories by relying on the subsequent extrinsic verification of Cohen's second story by the Sheriff's deputies. The veracity prong of *Aguilar* may be met by a separate check of the informant's story *(People v Hanlon,* 36 NY2d 549, *supra; Prople v Hendricks,* 25 NY2d 129) which renders the source of the information relatively less important. (See *United States v Irby,* 304 F2d 280, cert den 371 US 830.) However, those cases in which the Court of Appeals has found veracity to be satisfied by independent verification have involved police observations of activity which could reasonably give rise to an inference that the defendants were engaged in criminal activity. *(People v Slaughter,* 37 NY2d 596 [police observations of known narcotics sellers entering defendant's hotel room]; *People v Alaimo,* 34 NY2d 187 [police observations of the defendant dropping betting slips]; *People v Cerrato,* 24 NY2d 1 [police observation of known drug dealers entering and leaving the premises]; *People v Marshall,* 13 NY2d 28 [police observation of the defendant in "suspicious

challenges to search warrant affidavits on the basis of false information provided by an informant precisely because the fact that the informant may have lied or been mistaken is irrelevant in determining what a reasonable affiant would have concluded at the time on the basis of the information he had been given. *(People v Slaughter,* 37 NY2d 596, *supra; People v Solimine,* 18 NY2d 477.)

activity" over a two and one-half week period]; *People v Coffey,* 12 NY2d 443, cert den 376 US 916 [information procured from other officers and from a wiretap].)

■ In this case there was no police observation of the defendants. The police surveillance of the premises revealed no activity prior to the raid. The sole verification consisted of comparing the physical description of the house where Cohen claimed the drugs were located with the address provided by the telephone company, and in the concurrence of the name Terry as one of the suppliers of the drugs and as the owner of the phone whose number Cohen was to call. The verification of these details is not sufficient to raise even an uncontradicted story given by an informant to the level of probable cause. Such a finding requires more than an observation of innocent detail or conduct. *(People v Verrecchio,* 23 NY2d 489 [observation of defendant conversing on the street with "known drug dealers" insufficient verification of informant]; *People v Corrado,* 22 NY2d 308 [observation of defendants exchanging sealed envelopes in car insufficient verification of tip]; *People v Horowitz,* 21 NY2d 55 [observation of individual meeting description of carrier of stolen bonds insufficient verification].) "Since the observed activities are susceptible of an interpretation of innocent activity, the informant's tip * * * should not be allowed to elevate these activities to the level of probable cause." *(People v Wirchansky,* 41 NY2d 130, 136, *supra.)* Inasmuch as the reliability of neither the informant nor his information can be established on this record, probable cause to search the premises was lacking.

■ Even if that issue were in doubt, however, the evidence would have to be suppressed due to the absence of sufficient justification for a search without a warrant. A warrantless search can be justified only under the most compelling circumstances of urgency. " '[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.' " *(Coolidge v New Hampshire,* 403 US 443, 454-455.) The element of a reasonable belief in imminent removal or destruction is crucial in justifying a warrantless search based on exigent circumstances. *(People v Vaccaro,* 39 NY2d

468; *People v Clements,* 37 NY2d 675, cert den *sub nom. Metzger v New York,* 425 US 911.)

In the case before us the only evidence which would support such a belief is Cohen's anxiety and his statements to the deputies, after the 7:00 P.M. deadline for his return had passed, that their delay was going to "blow his chance" to help himself because the defendants were going to clear out. But there is no reason to believe that Cohen himself was engaged in anything other than speculation. He was not a professional, this was his first drug transaction. Nor was he an intimate of the defendants. He did not know their last names, Cadby's proper first name or Kortum's address. Thus it is highly unlikely that his prediction of the defendants' future actions could have been anything more than speculation.

This is not a case where the information as to imminent removal or destruction was based on the informant's impressions secured only moments before the raid *(People v Clements, supra),* on actual observations by an informant with whom the authorities had a continuing relationship *(People v Vaccaro, supra),* or on facts observed or overheard which were of such an unambiguous nature that the only reasonable conclusion was that the evidence was about to be removed or destroyed. *(Thomas v Parett,* 524 F2d 779; *United States v Manning,* 448 F2d 992, cert den 404 US 995.)

The People seek to buttress their claim of exigency with the fact that the surveillance team saw someone coming out of the Prospect Avenue address and informed the arriving deputies who, on that basis, conducted the raid. However, the address was a multiple dwelling and the authorities admit they did not know whom they saw. When Deputy Karam radioed headquarters for permission to proceed, he noted that it appeared that something was being moved. But nowhere in the record does it appear whose observation formed the basis for that assertion. Karam specifically stated he saw nothing, and the various recountings of the raid leave much doubt as to whether any official saw anyone carrying anything. This speculation does not lend sufficient weight to Cohen's anxiety to form a reasonable belief that the drugs were in the process of being removed or destroyed.

■ We recently observed that in a doubtful or marginal case a search will be upheld where the *bona fides* of the police is demonstrated by their taking pains to get a warrant under pressing circumstances. *(People v Carmichael,* 61 AD2d 411.)

In this case the police began a warrant application about 6:15 P.M. By 7:15 P.M. they had received the information from the telephone company, checked the description of the house and contacted a Judge. Deputy Karam testified that he could finish a warrant application in about an hour. Yet at 9:45 P.M. when the defendants were arrested, the warrant application was still being processed. There is no reasonable explanation for the failure to get a warrant and the search cannot be countenanced. "[T]his type of situation may reoccur repeatedly and might lend itself to too easy a by-pass of the constitutional requirement that probable cause should generally be assessed by a neutral and detached magistrate before the citizen's privacy is invaded." *(United States v Rosselli,* 506 F2d 627, 630.)

The motion to suppress the evidence seized should be granted, the judgments of conviction reversed and the matter remitted for further proceedings.

MOULE J. P., CARDAMONE, SIMONS and HANCOCK, JR., JJ., concur.

Judgments unanimously reversed on the law and facts, motions granted and matter remitted to Supreme Court, Erie County for further proceedings.